Dear Secretary Herring:
Our office is in receipt of your December 1, 1994 letter in which you request an Attorney General's Opinion of whether the Louisiana Wildlife and Fisheries Commission ("Commission") has the authority to promulgate regulations imposing a moratorium on the issuance of new saltwater commercial gill net, trammel net, and fish seine gear licenses until such time as the Louisiana legislature adopts a limited entry program for those licenses. You have attached to your letter a proposed Declaration of Emergency which the Commission proposes to adopt to implement the moratorium.
The purpose for issuing the emergency regulation is found in the draft Declaration of Emergency whereby the Commission finds that sales of saltwater commercial gill net, trammel net, and seine gear licenses are increasing and greater levels of sales are expected in the near future. According to the draft Declaration, this could have negative social, economic, and management implications for fisheries utilizing these gears, and will have negative economic impacts on the fisherman currently using these gears. Further, according to the draft Declaration, both of these impacts constitute imminent peril to the public welfare of the State. While not stated in the Declaration, according to the minutes of the December 1, 1994 Commission Board Meeting, the increase and anticipated increase in sales is a result of an "invasion of gill nets" resulting from an "onslaught of fisherman coming into Louisiana". Ostensibly, a major cause of this increase in fisherman coming into Louisiana is the result of Florida banning the use of entangling nets in Florida in-shore waters.[1] Since the Commission believes the increase in license sales constitutes imminent peril to the public welfare of the State, it is considering adopting the moratorium as an emergency rule pursuant to R.S. 49:953(B)(1), thereby by-passing the more time consuming requirements of the normal rule making procedure.
Your question can more specifically be stated as whether the Commission has the legal authority to suspend the issuance of certain new fisheries licenses, and if so, whether the draft Declaration of Emergency is legally sufficient to accomplish that suspension through the emergency rule making procedures provided in R.S. 49:953B(1).
Article IX, Section 1 of the Louisiana Constitution provides:
 The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
Article IX, Section 7 provides: "The control and supervision of the Wildlife of the State, including all aquatic life, is vested in the Louisiana Wildlife and Fisheries Commission". This section further states that "the functions, duties, and responsibilities of the commission, and the compensation of its members, shall be provided by law." Thus, the Constitution provides a balancing between the independent Wildlife and Fisheries Commission's control and supervision over the wildlife of the state and the legislature's ultimate responsibility over the natural resources of the state. Given the language of Article IX that the functions, duties, and responsibilities of the Commission shall be as provided by law, the Commission's authority is subject to the direction of the legislature.[2]
Title 56 of the Louisiana Revised Statutes provides the general provisions for wildlife and fisheries. Through this title, the Louisiana legislature has enacted a legislative scheme for the taking of fish and wildlife including several sections delineating the functions, duties, and responsibilities of the Commission.
These sections include Section 1A: ". . . all aquatic life is placed under the supervision and control of the Louisiana Wildlife and Fisheries Commission . . ."; Section 2: "The Commission shall have sole authority to establish definite management programs and policies . . ."; Section 3A: ". . . fish [and] other aquatic life . . . shall be under the exclusive control of the Wildlife and Fisheries Commission . . ."; Section 6 (10): "[ The Commission] shall for the comprehensive control of birds, shellfish, finfish, and wild quadrupeds, adopt rules and regulations not inconsistent with the provisions of this part . . ."; Section 6 (15): "In general [the Commission] has full power and control . . . over all fish, whether salt or freshwater . . ."; Sections 6(26): "[The Commission] [s]hall promulgate rules and regulations . . . to set seasons, times, places, size limits, quotas, daily take, and possession limits . . ."; Section 326.3: "[T]he commission may set possession limits, quotas, places, seasons, times, size limits, and daily take limits . . ."; and Section 638.5: "The Commission shall adopt such rules and regulations . . . for the harvesting, conservation, and management of all species of saltwater finfish, in accordance with [certain] standards:" One such standard allows the Commission, "if it becomes necessary", to allocate or assign fishing privileges among various fishermen. As can be seen by these grants of authority, it is clear the legislature intended that the Commission have broad authority to protect and properly manage the fisheries.
Part VI of Title 56[3] provides a comprehensive licensing scheme for recreational and commercial fishing. For commercial fishing it provides for the commercial fisherman's license, vessel license, wholesale/retail dealer's license, transport license, and gear license. A fisherman must acquire one or more of these licenses to commercially fish in Louisiana waters. R.S. 56:305.1 requires commercial fisherman to purchase a commercial gear license in order to use gill nets, trammel nets, or seines. Nowhere in this part, nor elsewhere in Title 56, does the legislature specifically provide for any type of moratorium on the issuance of licenses, although R.S. 56:301.5 gives the Commission the authority to ". . . promulgate rules and regulations concerning any aspect of licensing not specifically provided for in this part." As a licensing moratorium is not provided for in Part VI, it therefore falls within the confines of R.S. 56:301.5. Reading the broad authority granted to the Commission to protect and properly manage the fisheries along with the specific grant of authority to the Commission over aspects of licensing not specifically provided for elsewhere, it is clear the Commission has the authority to issue regulations placing a moratorium on the issuance of new commercial fishing gear licenses.
It is, therefore, the opinion of this Office that the Wildlife and Fisheries Commission has the legal authority to suspend the issuance of new commercial gill net, trammel net, and seine gear licenses.
The second part of your request asks whether the draft Declaration of Emergency is legally sufficient to accomplish the suspension of new licenses as an emergency rule pursuant to R.S.49:953B(1).[4] The normal rulemaking procedure of the Administrative Procedure Act ("APA") is found in R.S. 49:953A. Its features include notice, hearing, and public participation. Emergency rulemaking is an extraordinary exception to this norm, in that the executive agency unilaterally dispenses with these legal requirements and safeguards. R.S. 49:953B(1) provides, in pertinent part: "If an Agency finds that an imminent peril to the public health, safety or welfare requires adoption of a rule upon shorter notice than that provided in R.S. 49:953A . . ., it may proceed without prior notice and hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt an emergency rule . . ." The abbreviated notice for emergency rulemaking is less substantive and burdensome than that for the normal rule making process provided for in R.S. 49:953A, and allows any abbreviated notice which is practicable. "Imminent" means the peril to the public health, safety or welfare will occur prior to adoption of a permanent rule by the normal rule making procedure. Op.Atty.Gen., No. 90-226, May 25, 1990 and No. 90-226A, July 2, 1990.
Where valid grounds for invoking the emergency process are present, the content of the notice and procedure for hearing the emergency rule may be waived as necessary by the agency. However, the notice for an emergency rule must memorialize the grounds for the departure from the legislatively preferred procedure by stating facts which, if presumed true, constitute one of the harms included in Section 953B(1), one of which is imminent peril to the public health, safety or welfare. The notice for an emergency rule is the only notice the public will receive of the emergency and therefore, must within the notice itself, contain sufficient facts to inform the public of the emergency which allows the agency to bypass the normal rulemaking process. Thus, the emergency must exist and it must be factually described in the notice. It must also conform to one of the types of legal emergencies for which Section 953B(1) exclusively authorizes emergency rulemaking. Failure of an emergency rule to meet this requirement renders the rule null.
The factual basis underlying the imminent peril to the public health, safety or welfare justifying the emergency rule to place a moratorium on the issuance of certain commercial gear licenses, as provided in the draft Declaration, is that "sales of the above gear are increasing and even greater level of sales are anticipated in the near future". The draft Declaration then concludes, based on these facts, that negative social, economic, and management implications of the fisheries utilizing these gears could occur and negative economic impacts on the fisherman using these gears will occur.
These are the only facts presented in the draft Declaration and are therefore the only facts which may be considered to determine whether imminent peril exists justifying use of the emergency rulemaking procedure. Stated slightly differently, the peril imminent to the public health, safety and welfare is the possibility of a negative impact on the fisheries utilizing these gears and the negative economic impacts on the fisherman resulting from an increase in the sales of certain gear licenses. Certainly inherent in a licensing system such as the one for commercial fishing are annual fluctuations in the number of licenses issued.[5] There is nothing within the language of the draft Declaration indicating this years increase is an abnormal increase in license sales or, for that matter, the facts supporting the Commission's belief this years increase will result in negative impacts on the fisheries and the fishermen. Even presuming the facts as true, the statement in the draft Declaration is not factually sufficient to describe such imminent peril to the public health, safety and welfare justifying use of the emergency rulemaking provision. Statements made during the December 1, 1994 Commission Board Meeting indicate an expectation that there will be an abnormal increase in the number of nonresident fisherman purchasing Louisiana fishing licenses and fishing in Louisiana waters. There is also factual information indicating this increase is a result of Florida banning the use of certain nets in Florida waters.[6] Certainly, these additional facts provide more grounds for the belief that increased sales will result in imminent peril, and if included in the Draft Declarationmay be sufficient to justify use of an emergency rule, but as these facts were not included they cannot be considered. We cannot conclude, solely from the language of the draft Declaration, that a sufficient factual basis exists to allow use of the emergency rulemaking provision.
The notice of intent for an emergency rule is intended to be a self-contained document, containing all necessary information mandated by the APA to constitute the requisite legal notice. In addition to containing the substantive factual basis constituting the emergency, it must also contain the applicable procedural information required by the APA. This includes the fiscal impact statement or economic impact statement required by R.S.49:953A(1)(a)(ii) or (iii). We have not been provided with this information and do not know if the Commission intends to include it in the notice of intent. If the procedural information required pursuant to the APA is not included, the emergency rule will be invalid.
Additionally, an emergency rule must conform to the time constraints of R.S. 49:954B(2), which limits the effective period of the rule to no longer than one hundred twenty days. The draft Declaration states that the prohibition on the issuance of new licenses shall remain in effect until a limited entry program is adopted by the Louisiana Legislature. As there is no guarantee the Legislature will adopt a limited entry program or do so within one hundred and twenty days, the draft Declaration is in contravention of R.S. 49:954B(2), and for this reason would also be invalid.
For the reasons stated above, it is the opinion of this Office that the Commission has the authority to place a moratorium on the issuance of new commercial gill net, trammel net, or seine gear licenses and may do so through the emergency rulemaking provisions of the Administrative Procedure Act, provided the requirements of the emergency rulemaking provisions are met. It is further the opinion of our Office that the draft Declaration of Emergency, as written, does not contain sufficient factual information to conclude that an emergency exists allowing use of the emergency rulemaking provisions. Additionally, an emergency rule would need to meet the applicable procedural requirements and be limited to an effective period of no more than one hundred twenty days.
I trust this opinion answers you questions. Should you need further assistance in this matter, please do not hesitate to contact our office.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: _____________________________ FREDERICK C. WHITROCK Assistant Attorney General
RPI/FCW/tp
[1] Article X, Section 16 of the Florida Constitution, approved in November, 1994,
The Advocate, 1/6/95, page 8D
[2] Aguillard v. Treen, 440 So.2d 704 (La. 1983).
[3] R.S. 56:301 et seq.
[4] R.S. 49:967D is inapplicable as it only applies to setting certain seasons and size limits. Op.Atty.Gen., No. 88-102, March 9, 1988.
[5] According to statistics provided by the Department of Wildlife and Fisheries, 985 commercial saltwater gill net licenses were issued for 1993 and 1144 for 1994. There were 641 mullet licenses issued for 1993 and 777 for 1994.
[6] The Advocate, 1/6/95, Section D, page 8.